Filed 1/27/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re N.R., a Person Coming Under the Juvenile Court Law. | B322164 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 18CCJP03467A |
| Plaintiff and Respondent, | |
| v. | |
| V.R., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County. Daniel Zeke Zeidler, Judge. Affirmed.

Donna B. Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Appellant V.R. is the mother of now 11-year-old N.R. Mother appeals the juvenile court's order terminating her parental rights as to N.R. Mother argues that the order is unsupported by clear and convincing evidence of parental unfitness or child detriment. Specifically, she argues that termination cannot be predicated on earlier, unchallenged findings of parental unfitness or child detriment as to N.R. because, after N.R. and her younger half sister R.L. were removed from mother's custody, the juvenile court returned R.L. to mother. According to mother, R.L.'s return to mother "rebutted" the earlier findings as a matter of law. If these earlier findings are disregarded, mother continues, no substantial evidence otherwise supports termination of her parental rights as to N.R.

We are unpersuaded by the logic of mother's argument. Ascertainment of parental fitness or child detriment is a child-by-child inquiry. That the juvenile court found it appropriate to return R.L. to mother's custody does not undermine its earlier findings regarding mother's relationship with N.R. The juvenile court was therefore entitled to rely on those earlier findings, in accordance with *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242 (*Cynthia D.*), in terminating mother's parental rights as to N.R. We affirm.

## BACKGROUND

Mother has two children, N.R. and R.L. N.R. and R.L. are half sisters. R.L. is not part of this appeal.

These proceedings began in early 2018, when N.R. was six and R.L. was 10 months, following six separate referrals to the Los Angeles County Department of Children and Family Services (Department). These referrals included multiple alleged

2

incidents of physical and emotional abuse of N.R. by mother. No allegations of similar abuse towards R.L. were reported. However, other allegations raised concerns about the safety of both children. These included that mother had various adults at her home using drugs and alcohol; some guests mother brought into the home were violent; mother was using drugs and prostituting herself; mother was assaulted in the home by acquaintances in the children's presence; and the home was dirty and lacked sufficient food.

After an investigation, the Department filed a petition with the juvenile court in May 2018. The petition contained counts relating to both children under Welfare and Institutions Code[1] section 300, subdivisions (a) and (b)(1), based on alleged physical abuse of N.R. by mother, and under subdivision (b)(1), based on R.L.'s father's criminal history. Additional counts relating only to R.L. were under subdivision (d), based on her father's criminal history, and under subdivision (j), based on alleged physical abuse of N.R. by mother.

Mother denied the allegations of the petition at her initial appearance. The juvenile court ordered the children detained but released them to mother's home. At the jurisdictional and dispositional hearing in July 2018, mother pled no contest to the petition as amended. The juvenile court sustained the petition as to N.R. under section 300, subdivision (b)(1) based on mother's inappropriate discipline of N.R. It sustained the petition as to R.L. under subdivisions (b)(1) and (j) based on mother's inappropriate discipline of N.R., and under subdivisions (b)(1)

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

and (d) based on R.L.'s father's criminal history.  The juvenile court left the children in mother's custody and ordered services.

Less than three months later, in October 2018, the juvenile court removed the children from mother's home based on subsequent and supplemental petitions under sections 342 and 387 alleging that mother suffered from emotional problems that placed her children at risk of harm.  Mother had made threats to her Regional Center case worker, and she allowed a maternal uncle who had molested maternal aunt as a child to have unlimited access to the children.  Further, mother had violated court orders by allowing R.L.'s father to have access to the children.  There was also an incident in which maternal uncle was stabbed at mother's home in the children's presence.  The fracas resulted in a physical injury to N.R., but mother did not seek medical care for her.  The Department observed that mother had become "increasingly agitated and verbally abusive to [N.R.]," and that N.R. "started to pick up mother's behaviors and [wa]s exhibiting behavioral issues."  Mother denied the allegations, but the juvenile court ordered the children removed from mother.  The children were placed in foster care.

On November 26, 2018, the juvenile court sustained amended allegations in the subsequent and supplemental petitions.  The court found "by clear and convincing evidence [that] remaining in the home of the mother would pose substantial danger and risk of detriment to the children's physical, health, safety, protection, or physical or emotional well-being."  Mother was ordered to receive monitored visitation and to participate in services.

According to the Department's July 2019 status review report, N.R. was hospitalized for suicidal ideation in May 2019.

4

She and R.L. were placed with maternal great-aunt following N.R.'s release from the hospital. It was N.R.'s fourth placement since she was detained from mother. She was hospitalized again later that month and again in June 2019, after she complained of auditory hallucinations that were telling her to kill R.L. Maternal great-aunt was struggling to care for N.R. and sometimes required police intervention to deal with her behaviors. In contrast, maternal great-aunt reported "she ha[d] not had any issues with [R.L.]." Maternal great-aunt asked for the children to be removed from her home in July 2019 due to housing issues.

At the time of the July 2019 status review, mother had moved into temporary housing provided by the Regional Center, and she was working at a toy factory. Mother had completed her parenting, counseling, and anger management programs but chose to continue participating in the programs. She was actively participating in her services and receiving substantial support from the Regional Center.

Mother consistently visited the children. The visits generally went well, except that mother had a difficult time managing N.R.'s behaviors and required assistance from the social worker. The social worker noted that mother "is a trigger" for N.R. During N.R.'s psychiatric hospitalizations, mother frequently made her upset.

N.R.'s behaviors continued to be problematic, and she had to be re-placed multiple times over a period of several months. "Most times, the caregivers asked for [N.R.] to be immediately picked up after less than a week in the home. It was then determined that due to [N.R.'s] behaviors and the level of care

needed, the Department needed to pursue a more intensive placement with a caregiver trained to work with [N.R.'s] needs."

In September 2019, N.R. was placed with a highly trained caregiver through the Intensive Services Foster Care program. This was her 11th placement. Because of the high level of care she required, N.R. and R.L. could not be placed together. In contrast to N.R.'s challenges, R.L. was reported to be "adjusting and doing well" in the home of her caregiver, with only limited concerns about intellectual and social development.

The Department's November 2019 status review report noted that N.R. had not expressed any recent suicidal ideation, but she expressed "homicidal ideation when she is upset." N.R.'s therapist was working to help her decrease her tantrums, but those tantrums made it difficult to take her out in the community and created safety risks. No similar issues were reported as to R.L.

As of November 2019, mother had complied with most aspects of her case plan. However, the Department did not recommend that the children be returned to her as mother remained a "trigger" to N.R. and did not seem to understand the extent of N.R.'s significant needs.

In early November 2019, N.R. was suspended from school for taunting and screaming at other children. The following day, she had another psychiatric hospitalization which lasted 12 days. She was diagnosed with "Sever[e] Bi-Polar Disorder." She was hospitalized again in late December 2019 after assaulting her foster sibling, punching holes in the wall of her foster home, and assaulting her in-home counselor. This hospitalization lasted a week. R.L. experienced no similar issues.

6

N.R.'s therapist reported that N.R. had daily verbal outbursts, physical aggression, and made threats to others. She was not responding well to therapy. She continued to be triggered by visits with mother, and the therapist believed beginning conjoint therapy with mother would not benefit N.R. until she was more stable. N.R. continued to be "more triggered as a result of conversations and visits with mother." No similar issues were reported as to R.L.

As of January 2020, mother was still living in the Regional Center facility, which did not allow overnight visitation with N.R. and R.L. or permit them to reside with her. Mother was still looking for appropriate housing.

N.R.'s foster mother reported that her behaviors escalated after visits with mother. Mother still did not appear to understand the severity of N.R.'s issues. And she still was often unable to manage N.R.'s behaviors during visits and struggled to handle N.R. and R.L. together. According to the foster mother, N.R. was working to control her behavior but continued to be aggressive with her foster siblings.

N.R. was hospitalized again in early January 2020. Later that month, her caregiver gave a 14-day notice to have N.R. removed from her home. N.R. was initially placed in shelter care because the Department could not find an available placement. She was placed with a new caregiver at the end of January. She continued to have aggressive tantrums and physical confrontations with her caregiver and other children.

As of the Department's April 2020 status review report, mother had still not secured housing where the children could be placed with her. She continued to participate in programs and was still employed. Mother was making some progress with

achieving treatment goals in individual therapy. However, she still struggled to control N.R.'s aggressive behaviors during visits and required help in managing the children and ensuring their safety. In one instance, N.R. threw a tantrum during which she pushed R.L.'s high chair. Visit monitors had to intervene to protect R.L. from harm.

The Department reported that "many people who have observed mother with her children believe that mother is not able to adequately and safely care for both children due to mother's own limitations, along with high level of needs the children have. It is clear to the Department that mother deeply loves and cares for her children. However, for the safety and well-being of her children, the Department feels that without significant, 24 hour assistance from the regional center, the Department cannot recommend that the children return to the care of the mother." It recommended that reunification services be terminated.

The review hearing was continued due to the COVID-19 emergency.

According to the Department's August 2020 supplemental report, N.R. was struggling with virtual learning. Moreover, she had broken her caregiver's glass coffee table and washing machine, and made a hole in the wall. N.R.'s therapist reported that she had great difficulty coping with her negative emotions, and the therapist was worried she would regress significantly if reunified with mother. No similar issues were reported as to R.L.

At the August 24, 2020 review hearing, the juvenile court continued mother's reunification services and set the matter for a section 366.25 permanency planning hearing on February 23, 2021. Despite mother's "substantial" progress toward alleviating the causes necessitating placement, the court again found by

"clear and convincing evidence that return of the child[ren] to the physical custody of [mother] would create a substantial risk of detriment to the child[ren] . . . ."

According to the Department's November 2020 report, N.R.'s caregiver asked that N.R. be removed from the caregiver's home in October 2020. N.R. had been terminated from her daycare program due to her daily disruptive behavior. N.R. was transitioned back to her maternal great-aunt's home, where R.L. was also placed. This was N.R.'s 13th placement. Maternal great-aunt reported that N.R. was doing well in her home.

Mother had moved into her own apartment by late October 2020. She was receiving parenting instruction through the Regional Center. The Department recommended that the children remain with maternal great-aunt, with the goal of gradually transitioning them back to mother's care. The contemplated transition called for the children to be placed with mother separately to "reduce[] the likelihood of mother becoming overwhelmed" with two children.

In November 2020, mother started to have overnight weekend visits with the children. Regional Center staff were present to assist mother for the duration of the visits. Mother's parenting partner reported that the visits generally went well. However, on several occasions, N.R. refused to visit or did not want to stay overnight. N.R. reported that mother tried to force N.R. to speak with R.L.'s father on the phone, even though N.R. did not want to. No similar issues were reported as to R.L.

In February 2021, the Department reported that N.R. and R.L. were progressing in the care of maternal great-aunt. N.R. in particular was "doing better in virtually all areas of her life. [She] attended school more regularly and . . . started to like

school. While she . . . had some tantrums, there [were] no reports of suicidal ideations or hospitalizations as a result. [She] clearly ha[d] a very strong bond with [maternal great-aunt] and it appear[ed] that [maternal great-aunt was] able to meet the high level of needs that [N.R.] has."

N.R. told the social worker she did not want to live with mother. She wanted to be adopted by maternal great-aunt. According to N.R.'s therapist, N.R. experienced regressions in her behavior after visits with mother. She became upset when anyone tried to discuss living with mother. She also refused to participate in conjoint counseling with mother.

Despite all of the training she had received since 2018, mother still lacked insight about N.R.'s needs. She attributed N.R.'s problems to "guilt that [N.R.] feels for being the reason that the children were removed from [mother's] care." Nevertheless, the Department recommended that the children be returned to mother "if [she] continues to have significant assistance from the regional center."

N.R.'s court-appointed special advocate (CASA) reported that N.R. was doing very well in maternal great-aunt's care. Her tantrums had subsided, and her behavior was greatly improved. N.R. consistently told the CASA that she wanted to remain placed with maternal great-aunt and did not want to be returned to mother. N.R. did not feel "comfortable" with mother, and N.R. was worried that mother was not ready to care for her. N.R. reported that mother was speaking with R.L.'s father, and she was worried "her life will go back to 'the way it was' with her mother prior to her removal."

Maternal great-aunt also told the CASA that N.R. was resistant to contact with mother, and that she would have

tantrums to avoid visitation. In one instance, when mother came to maternal great-aunt's home to pick up N.R. for a visit, N.R. refused to go. Mother yelled at maternal great-aunt and used profane and threatening language, blaming her for N.R.'s refusal to see mother.

N.R. refused to speak about mother during her therapy sessions. Whenever the therapist tried to discuss mother, N.R. would shut down. Mother and N.R. had two conjoint therapy sessions, and mother appeared irritable and did not respect N.R.'s boundaries. N.R.'s therapist believed that mother had historically been dismissive of N.R.'s needs, depriving N.R. of the opportunity to develop self-expression skills, the resulting deficiencies being especially apparent in her mother's presence.

The CASA reported that the unanimous consensus among those professionals involved in N.R.'s case was "that [mother] is not ready [for reunification with N.R.], and [N.R.] would likely suffer as a result." The CASA recommended termination of mother's reunification services, and that N.R. remain placed with maternal great-aunt, where she was thriving.

The section 366.25 permanency planning hearing was held in March 2021. N.R. told the juvenile court she wanted to stay placed with maternal great-aunt, even if R.L. were returned to mother's care. The court found both that N.R. wanted to remain with the maternal-great aunt and that she did not want to be returned to mother. The latter, the court reasoned, supported a finding of substantial risk in the context of the record. On this basis, it concluded that "return of [N.R.] to the physical custody of the mother would pose substantial risk of detriment to her physical and/or mental health creating a continuing necessity for and appropriateness of the current placement outside of the

11

mother's care."  The court terminated reunification services, and set a section 366.26 selection and implementation hearing.  The court acknowledged that it was "very torn" because of mother's "tremendous growth," but that the court was concerned about mother's continued contact with R.L.'s father and the trauma to N.R. of being returned to mother's care.

In contrast, the juvenile court ordered R.L. placed in mother's home under supervision of the Department.

Shortly thereafter, mother filed a notice of intent to file a writ petition as to N.R.  We stayed the selection and implementation hearing to permit review but denied the writ petition on January 4, 2022.

In July 2021, the juvenile court held a review hearing for R.L.  It found that "mother ha[d] complied with the case plan and resolved the issues that brought [R.L.] into the system.  [R.L.] is no longer at risk."  It terminated jurisdiction with a custody order granting mother legal and physical custody.

The juvenile court held a review hearing regarding N.R. in September 2021.  The court had before it a report that N.R. was attending overnight visits with mother on a semi-regular basis.  No significant issues were reported regarding visits, but N.R. had refused to attend some.  She remained adamant that she "d[id] not want to live with mother again" and did not "feel comfortable" with mother.  The Department reported that N.R. was "far more stable" while placed with maternal great-aunt who was able to attend to N.R.'s "significant needs."  The Department maintained its recommendation of adoption by maternal great-aunt as N.R.'s permanent plan.  The juvenile court found continued jurisdiction over N.R. was necessary and found "by clear and convincing

12

evidence that return of [N.R.] to the physical custody of [mother] would create a substantial risk of detriment to [N.R.] . . . ."

In a March 2022 status review report, the Department reported that N.R. had graduated from intensive clinical services and was participating in weekly individual counseling. She remained comfortable in maternal great-aunt's home, and she wanted to be adopted by maternal great-aunt. N.R. appeared to respect the authority of maternal great-aunt more than anyone else.

The Department reported that, during an extended visit with mother in December 2021, N.R. said she wanted to live with mother. But that desire was short lived. Later in the same visit, mother told N.R. she wanted to "get rid of her" and then proceeded to ignore N.R. Following the visit, N.R. told a social worker she still wanted to live with maternal great-aunt, and she no longer wanted to visit mother at all. Despite that, after the December 2021 visit, N.R. attended some weekend visits with mother.

The Department further reported that it was in the process of investigating a referral from January 2022 related to mother's care of R.L. The Department also reported that mother was investigated for neglect of R.L. in 2021, but the referral was closed at the end of the year because the Department was unable to make contact with mother and R.L.

In March 2022, the juvenile court continued the section 366.26 hearing to May 2022 for a bonding study to assess N.R.'s bonds with R.L. and with mother. The bonding study evaluator opined that there would not be a deleterious impact on N.R. if parental rights were terminated. The evaluator noted that N.R. did not appear to have a connection with mother, and

mother and N.R. were not affectionate with one another. The evaluator said there appeared to be tension and disconnect between N.R. and mother, and mother was detached and unaffectionate with N.R. Similarly, N.R. did not initiate affection toward R.L.

N.R. told the bonding study evaluator that she was afraid to spend the night with mother, and she did not want to live with mother. The bonding study evaluator noted that N.R.'s "general theme in regard[] to living with mother pertains to her feeling unsafe." When mother left the bonding study, she did not initiate contact with N.R. before she left the room. The bonding study evaluator opined that mother was insensitive to N.R.'s needs and blamed others for N.R.'s emotional problems. In contrast, the bonding study evaluator observed that mother's relationship with R.L. was positive and described the reciprocal affection between mother and R.L. The bonding study evaluator noted that mother was affectionate and caring toward R.L. and opined that mother and R.L. had a mutual connection.

The juvenile court proceeded with the section 366.26 hearing in May 2022. The court considered the entire contents of the court file and mother's testimony. Counsel for mother argued that the sibling-relationship and the parental-benefit exceptions to adoption precluded the termination of mother's parental rights. Counsel for N.R., joined by counsel for the Department, asked the court to terminate mother's parental rights because no exception to adoption applied.

Upon the conclusion of argument, the juvenile court found by clear and convincing evidence that N.R.'s return to mother's custody would be detrimental to her. The court stated: "And that really is a big part of this case, considering the mother was able

14

to regain custody of [R.L.], but not of [N.R.]. And a big part of that was the extent that it would be traumatic to [N.R.] to return her to the mother, which really is a part of the dynamics of their relationship, that the court needs to be looking to that relationship." The court further relied on the bonding study and said it would be "pretty much impossible for this court to find that the relationship is one that it would be detrimental to the child to sever." The court terminated parental rights, finding by clear and convincing evidence N.R. was adoptable and no exception to adoption applied.

Mother filed a timely notice of appeal from the termination of her parental rights.

## DISCUSSION

Mother makes a constitutional challenge to the juvenile court's order terminating her parental rights as to N.R. According to mother, the order violated her due process rights in a parental rights proceeding, as established in *Santosky v. Kramer* (1982) 455 U.S. 745 (*Santosky*), because it was unsupported by clear and convincing evidence of mother's parental "unfitness." She argues, for the first time on appeal, that earlier findings otherwise sufficient to support termination had been "rebutted" by the court's decision to return R.L. to her care and could no longer be applied to N.R. Importantly, mother does not challenge the earlier findings that she claims have been rebutted as a matter of law.

The Department argues that mother forfeited her argument; that if she did not, it is without merit; and even if it were meritorious, the juvenile court made the requisite findings as to N.R. after it returned R.L. to mother's custody.

We consider mother's argument, find it unmeritorious, and affirm on that basis.

## 1.    Forfeiture

A claim of error on appeal may be deemed forfeited if the objection was not raised in the trial court.  (*In re T.G.* (2013) 215 Cal.App.4th 1, 13–14.)  However, " 'application of the forfeiture rule is not automatic.' "  (*Id.* at p. 14.)  When a party raises an important constitutional claim, we may exercise our discretion to consider its merits.  (*Ibid.*)  Due process claims relating to the adequacy of findings to support termination of parental rights have been recognized as sufficiently important to evade forfeiture.  (See *ibid.*; see also *In re Gladys L.* (2006) 141 Cal.App.4th 845, 849 [declining to apply forfeiture where no findings made against presumed father before termination of parental rights]; *In re Frank R.* (2011) 192 Cal.App.4th 532, 539 ["we are reluctant to enforce the waiver rule when it conflicts with due process"].)  We therefore decline to apply the forfeiture rule in this case.

## 2.    Governing Law and Standard of Review

In most cases, due process prohibits judicial termination of parental rights absent clear and convincing evidence of parental unfitness.  (*Santosky*, *supra*, 455 U.S. at p. 769; but see *Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1130 [requirement inapplicable to rights of noncustodial parent in guardianship proceeding].)

Parental unfitness is a generic term that describes grounds for denying a custodial parent, or one otherwise fully committed to their parenting responsibilities, custody of their child.  (See *Guardianship of Ann S.*, *supra*, 45 Cal.4th at pp. 1130–1131.) "The terms [states use] to describe parental unfitness are

16

linguistically variable and include parents who have failed, refused or neglected to provide proper or necessary care; children who are neglected, deprived, or abused; children who are in need of supervision; or the parents who have failed to maintain contact with the child or to plan for his or her future." (*In re Heather B.* (1992) 9 Cal.App.4th 535, 556.)

While the terminology varies, a finding of parental unfitness requires some fault or shortcoming on the part of the parent. (*Guardianship of Ann S.*, *supra*, 45 Cal.4th at p. 1130 ["[W]hen a custodial parent faces termination of his or her rights . . . there is no dispute that the best interest of the child would not be a constitutionally sufficient standard for terminating parental rights" (citation omitted)]; *Reno v. Flores* (1993) 507 U.S. 292, 304 [" '[T]he best interests of the child' is not the legal standard that governs parents' or guardians' exercise of their custody: So long as certain minimum requirements of child care are met, the interests of the child may be subordinated . . . to the interests of the parents"].) However, the necessity of parental fault or shortcoming does not preclude consideration of other factors. The best interest of the child, while not determinative, is nonetheless an "important consideration." (*In re Heather B.*, *supra,* 9 Cal.App.4th at p. 556.)

Under current California dependency law, the standard for parental fitness is expressed in terms of "detriment" to the child. (*In re Frank R.*, *supra*, 192 Cal.App.4th at p. 537 [parental unfitness established upon " 'a finding that awarding custody of a dependent child to a parent would be detrimental to the child' "].) Detriment is considered under the constitutionally minimum clear and convincing evidence standard at the removal stage. (*Id*. at pp. 538–539; see also *Cynthia D.*, *supra*, 5 Cal.4th at

17

p. 253.)  At that juncture, the juvenile court may find detriment where, among other things, clear and convincing evidence shows "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."  (§ 361, subd. (c)(1).)  The question of detriment is revisited at subsequent hearings, at which the county welfare department bears the burden to show, by a preponderance of the evidence, that returning the child to the care of the parent "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."  (§ 366.21, subd. (e)(1) [six-month review], *id.,* subd. (f)(1) [12-month permanency hearing], § 366.22, subd. (a)(1) [18-month permanency review].)

The detriment determination is necessarily made by reference to circumstances of the family involved, giving due consideration to the faults or shortcomings of the parents as well as the specific needs of the child.  (See, e.g., *In re Jasmon O.* (1994) 8 Cal.4th 398, 426 [noting evidence of detriment based on "father's unfitness to meet [daughter's] extraordinary needs"]; see also *id.* at p. 437 (dis. opn. of Baxter, J.) ["I do not dispute that the finding of unfitness should be based on the circumstances of the particular parent and child rather than on some abstract ability to parent"].)

The dual considerations of parental capability and child needs permit—and indeed require—a child-by-child determination of parental fitness.  Whereas a parent may be "fit" to have custody of one child, the same may not be true of a sibling

with different needs. "Parental rights to one of several children may be constitutionally severed because it would be *detrimental* to that particular child to maintain them, while it would not be as to the others." (*In re Cody W.* (1994) 31 Cal.App.4th 221, 226.)[2]

Even though a finding of detriment is a prerequisite to terminating parental rights pursuant to section 366.26, the detriment finding need not be made *at* the section 366.26 hearing. This is because "the purpose of the section 366.26 hearing is not to accumulate further evidence of parental unfitness and danger to the child, but to begin the task of finding the child a permanent alternative family placement." (*Cynthia D.*, *supra*, 5 Cal.4th at p. 253.) The juvenile court's prior findings of detriment that brought it to the point of considering termination of parental rights are sufficient to satisfy due process for termination. (*Id.* at pp. 254–256.)

### 3. Analysis

Mother argues that *Cynthia D.*'s prior findings rule cannot operate here, where the juvenile court returned R.L. to her custody between the date of the children's removal and the date the court terminated mother's parental rights as to N.R. According to mother, R.L.'s return implied she "was again a fit

_____

[2]    This concept is not unique to California. For example, the Supreme Court of Massachusetts concurs that " '[o]ne who is fit to parent in some circumstances may not be fit if the circumstances are otherwise. A parent may be fit to raise one child but not another.' " (*R.D. v. A.H.* (2009) 454 Mass. 706, 715.) Likewise, the District of Columbia's high court recognizes that "[f]itness must be determined in reference to the specific child at issue, taking account of any special needs or extenuating circumstances—'[a]n individual may be a fit parent for one child but not for another.' " (*In re J.O.* (D.C. 2017) 174 A.3d 870, 882.)

parent as to [R.L.]," as a consequence of which "the juvenile court's prior finding in [N.R.]'s case of unfitness/detriment was rebutted."

The problem with mother's argument (aside from the lack of authority to support it) is that it treats her children as fungible. They are not. As set forth above, parental fitness is not a set of skills cognizable in the abstract. Put another way, there is no "general" parental fitness, as mother calls it. Rather, parental fitness must be determined by assessment of a particular parent's capacity to nurture and care for a particular child. (See *In re Cody W.*, *supra*, 31 Cal.App.4th at p. 226; see also *In re Jasmon O.*, *supra*, 8 Cal.4th at p. 426.) The record in this case illustrates why.

Our lengthy recitation of the facts reflects that parenting N.R. poses greater challenges than does parenting R.L. The children's respective histories of foster placements are instructive. N.R. required new placements on multiple occasions because experienced, licensed foster parents, some supported by Intensive Services Foster Care teams, were unable to control or tolerate her behavior. No such reports were made as to R.L.

As generally challenging as parenting N.R. proved to be, the challenges were magnified for mother. Mother and N.R.'s relationship is burdened by a history of conflict and emotional baggage that caused mother to be a "trigger" for N.R. Contact with mother exacerbated N.R.'s behavioral issues. The same was not true for R.L.

And, despite extensive documentation of N.R.'s peculiar needs and training in addressing them, mother failed to accept their severity or causes and continued to struggle with them. Mother was unable to control N.R.'s aggressive behavior to such a

20

degree that it at times endangered R.L.  The Department reported a professional consensus that mother was ill-equipped to handle N.R. and R.L. together.

The differences between the children and mother's ability to parent them were reflected in the juvenile court's orders from the outset of the proceedings.  N.R. was adjudicated a dependent based on mother's resort to "inappropriate discipline" as she struggled with N.R.'s behavior.  It sustained the petition as to R.L. based on mother's same inappropriate discipline of *N.R.* (as well as R.L.'s father's criminal history).  And when the juvenile court made the decision to terminate jurisdiction as to R.L., because the issues that brought R.L. into the dependency proceedings had been resolved, the court continued jurisdiction as to N.R.  Mother's relationship with N.R. remained fraught to such a degree that the court viewed the trauma to N.R. of returning to her mother's home as posing a substantial risk of detriment to her physical and/or mental health.

In short, the record reflects manifest differences between N.R.'s and R.L.'s needs and mother's ability to parent each child. Throughout the proceedings, the juvenile court carefully considered this evidence and the respective risks the children faced in mother's care.  We therefore reject mother's argument that R.L.'s return to mother rebutted or otherwise limited the vitality of prior findings of mother's unfitness to parent N.R. or the detriment to N.R. of remaining in, or being returned to, mother's custody.  Notwithstanding its order returning R.L. to mother's custody, due process permitted the juvenile court to rely on such findings at the section 366.26 hearing in accordance with *Cynthia D., supra*, 5 Cal.4th at pages 254–256.

## DISPOSITION

The juvenile court's order terminating parental rights as to N.R. is affirmed.


GRIMES, J.

WE CONCUR:


STRATTON, P. J.


WILEY, J.